IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEVIN SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 16 CV 1877 |
| | ) |
| DR. LOUIS SHICKER, et al. | ) Judge Sharon Johnson Coleman |
| | ) Magistrate Judge Sidney I. Schenkier |
| Defendants. | ) |

**Memorandum in Support of Plaintiff's Renewed Motion For A Court Appointed Expert
And Full Apportionment of Compensation For Such Expert to Defendants**

**INTRODUCTION**

Plaintiff, Kevin Smith, is currently incarcerated at Stateville Correctional Center ("Stateville"). Mr. Smith filed the present civil rights action pursuant to 42 U.S.C. §1983, *pro se*, *in forma pauperis*, alleging, *inter alia*, that Dr. Obaisi in his individual capacity (now Ghaliah Obaisi, Independent Executor of the Estate of Saleh Obaisi), Dr. Funk in his individual capacity, and Dr. Funk in his official capacity/Wexford Health Sources, Inc. were deliberately indifferent to Mr. Smith's serious medical needs in violation of the Eighth Amendment. On March 9, 2016, the undersigned counsel was recruited to represent Mr. Smith pursuant to Local Rule 83.37. Since being recruited to represent Mr. Smith, the undersigned counsel has zealously advocated Mr. Smith's position on a strictly *pro bono* basis.

Specifically, Mr. Smith alleges that the defendants were, among other things, deliberately indifferent in diagnosing and treating the excruciating pain he experienced for years on the entire right side of his body from the crown of his head to his toes. While Mr. Smith repeatedly asked for appropriate medical treatment and diagnosis including requests for a neurological evaluation those requests were routinely dismissed until years later when an outside provider also asked for a

1

neurosurgery consult. It is now known that Mr. Smith suffers from spinal stenosis, bulging and herniated disks, spinal nerve impingement, **and** that sometime in the past Mr. Smith also suffered a traumatic brain injury, most probably a hemorrhagic stroke, with resulting damage to the left frontal lobe of his brain. Defendants have retained two hand-picked seasoned medical experts to opine on their behalf. Mr. Smith being indigent does not have funds to retain his own medical expert. Accordingly, he is completely and totally dependent on this court to provide a balanced playing field to evaluate the merits of his case. Mr. Smith appreciates that a neutral expert is just that and a neutral expert may or may not conclude the medical evidence supports Mr. Smith's claims. However, without the aid of a neutral witness to inform the court and the jury of the involved complex medical issues without question there will be a prejudicial imbalance in favor of defendants unfair to Mr. Smith. Accordingly, Mr. Smith respectfully requests that this court exercise its discretion and appoint one or more qualified medical experts[1] to assist in the efficient and just resolution of this matter, and in view of Mr. Smith being indigent and defendants having ample resources that the court apportion the cost of the neutral expert(s) to defendants, in the first instance.

## **BACKGROUND**

1. Prior to filing this action in January of 2016, Mr. Smith exhausted his administrative remedies including the filing of grievances on January 14, 2014, November 13, 2014, and April 19, 2015, relating to his complaints concerning his excruciating right side body pain from the

---

[1] Federal Rules of Evidence706 expressly authorizes appointment of "expert witnesses." Fed.R.Evid.706(a) (emphasis added); *Gates v. U.S.*, 707 F.2d 1141,1144 (10th Cir. 1983) (personal injury action related to swine flu vaccine in which district court appointed panel of three medical experts to assist court in resolving complex medical issues, and appellate court affirmed district courts' broad discretion under Fed.R.Evid.706(a) to appoint panel of medical experts).

crown of his head down and the lack of diagnosis and appropriate treatment thereof. Complaint, Exhibits 1, 6, and 12. Docket document #6.

2. Mr. Smith was approved for a limited cervical MRI on May 19, 2014. Ex. 1. That MRI was conducted at the University of Illinois Medical Center ("U of I") but not until December 11, 2014. Ex. 2. A lumbar MRI, specifically later requested by the U of I, was approved by defendants and took place on March 31, 2016. Ex. 3. In between, on August 14, 2015, Dr. Mekhail an outside provider at the U of I saw Mr. Smith for an orthopedic evaluation of Mr. Smith's lower back and confirmed Mr. Smith had anatomical correlation with some of his pain, and requested a neurosurgery second opinion. Ex. 4.

3. Dr. Konstantin Slavin is a Board Certified neurosurgeon at the U of I. Subsequent to Mr. Smith filing this instant action, Dr. Slavin, acting as an outside provider to Wexford/Stateville, treated Mr. Smith on two occasions, June 13, 2016, and March 27, 2017. Ex. 5 & 6.

4. On October 25, 2016, over two and a half years after Mr. Smith's first grievance (and over three (3) years after his specific complaints which lead to the present action), Mr. Smith finally received a brain MRI, initiated as a result of Mr. Smith's June 13, 2016, visit with Dr. Slavin. Ex. 7.

5. Dr. Slavin reviewed the results of the brain MRI with Mr. Smith during Mr. Smith's March 27, 2017, visit with Dr. Slavin. According to Dr. Slavin's March 27, 2017, Neurosurgery Note, Mr. Smith's brain MRI "clearly shows a large area of missing brain matter in the left frontal region." And, Dr. Slavin reported: "[Mr. Smith's] right-sided symptoms now seem to be more explained by the patient's brain situation." Dr. Slavin also reported that it was hard to say whether Mr. Smith suffered an ischemic stroke or a hemorrhagic stroke that he felt "that most likely [Mr. Smith] did have hemorrhagic stroke in the very beginning." Ex. 6.

6. The undersigned counsel for Mr. Smith served a Rule 45 deposition subpoena on Dr. Slavin. Dr. Slavin's assistant then provided the undersigned counsel with a fee schedule and advised that the University of Illinois Medical Center would require prepayment of $1500/hr in order to take Dr. Slavin's deposition. See Exhibit 8 – Email from Cheryl Doot. As set forth in the fee schedule, Dr. Slavin does not perform review of records except during a deposition and then at his $1500/hr rate.

7. Counsel for the parties thereafter appeared before Magistrate Judge Schenkier and when the undersigned counsel advised Judge Schenkier of the status with Dr. Slavin's deposition, counsel for defendants advised that defendants were also thinking of issuing a Rule 45 deposition subpoena to Dr. Slavin. Counsel for defendants did then serve a Rule 45 deposition subpoena on Dr. Slavin and paid him the fee for his deposition.

8. On September 19, 2017, the parties took the deposition of Dr. Slavin at the University of Illinois Medical Center. Ex. 9, Slavin Dep.

9. Based upon Dr. Slavin's written reports relating to Mr. Smith, and Dr. Slavin's deposition testimony, on November 3, 2017, plaintiff's undersigned counsel served Plaintiff's First Rule 26(a)(2) Disclosure identifying Dr. Slavin as a non-retained expert witness and setting forth a summary of the facts and opinions of Dr. Slavin's expected trial testimony. Ex. 10.

10. On January 2, 2018, defendants served Defendants' Rule 26(a)(2) Disclosures. Defendants Disclosures identified and supplied expert reports for two (2) retained experts: Dr. David M. Mathis of Napa, California, Board Certified in Family Medicine and working for the California Correctional System, charging $600/hr; and, Dr. Andrew Stephen Zelby of Westchester, IL, a Board Certified neurosurgeon, charging $800/hr. Defendants Disclosures

4

also identified three (3) non-retained expert witnesses, one of which was also Dr. Slavin. Ex. 11.

11. The expert report from Dr. Mathis purports to set forth a fifteen (15) page chronological summary of Mr. Smith's medical records from 1989 to the March 27, 2017, visit Mr. Smith had with Dr. Slavin, after which account Dr. Mathis sets forth his opinions, including his opinion "Dr. Obaisi's decision-making was reasonable, appropriate, and in compliance with the Standard of Care at all times." Ex. 11, Mathis Report. p. 22. Invoices from Dr. Mathis reflect that, separate from assistants, he personally devoted 41.9 hours in review of records and the preparation of his report. See Ex. 12.

12. Dr. Zelby's expert report also purports to set forth a more limited version of Mr. Smith's medical records concluding with Dr. Zelby's opinions including: "There is no medical basis to suggest any intervention was ever indicated for the findings seen on Mr. Smith's MRI of the brain. There would have been no difference in Mr. Smith's care had these findings been identified earlier. Any earlier identification of the findings on the brain MRI would not have changed either Mr. Smith's treatment or any reduction in Mr. Smith's reported symptoms." Exhibit 11, Zelby Report, p. 4. While invoices from Dr. Zelby are not currently available to plaintiff, Dr. Zelby testified that he estimated he devoted 10 hours in review of records and the preparation of his report. Ex. 13, Zelby Dep., p.68.

13. Plaintiff deposed Dr. Mathis on July 16, 2018, and deposed Dr. Zelby on July 26, 2018. When deposed, both Dr. Mathis and Dr. Zelby testified that they based their opinions, in part, on examination of Mr. Smith's IODC written medical history – only a snapshot of such history was available to Dr. Slavin. See for example Ex. 13. Zelby Dep. pp. 33-37, Ex. 14, Mathis Dep. pp.24-25, Ex. 9, Slavin pp. 13, 34. Additionally, while both Dr. Slavin and Dr. Zelby

5

testified that they reviewed Mr. Smith's spinal and brain MRIs their interpretation of those MRIs and the relation to Mr. Smith's symptoms differed with Dr. Slavin testifying that Mr. Smith's right side body pain was more probably explained by his brain injury, and Dr. Zelby testifying that there was no correlation with Mr. Smith's brain injury and Mr. Smith's right side body pain. Ex. 9, Slavin Dep. pp. 28-29, Ex. 13, Zelby Dep pp. 44-45; also see Ex. 14, Mathis Dep. p. 57.

14. Mr. Smith is indigent and has been allowed to proceed *in forma pauperis,* and the undersigned appointed counsel is providing his legal services on a strictly *pro bono* basis.

15. While plaintiff served a Rule 26(a)(2) Disclosure identifying Dr. Slavin as a non-retained expert and set forth Dr. Slavin's anticipated testimony, such Disclosure is not evidence and plaintiff does not have direct access to Dr. Slavin, and plaintiff has no funds to hire a retained expert let alone funds to hire Dr. Slavin at $1,500 per hour.

16. Further, plaintiff's appointed counsel has tried to enlist but has been unsuccessful in enlisting an expert on a pro bono basis. Additionally, the undersigned appointed counsel has already incurred as of yet unreimbursed expenses exceeding $6,000.00 related to depositions in this case, separate and apart from other incurred as of yet unreimbursed expenses related to representation in this matter.

17. Wexford has a multi-year contract with the Illinois Department of Corrections worth over one hundred million dollars each year, and Wexford and its employees, e.g. Dr. Funk and Dr. Obaisi (now deceased) are covered by a liability insurance policy of up to $3,000,000 per claim. Ex. 15, Ex.16 [Excerpts of Wexford IDOC contract and insurance policy].

## ARGUMENT

### Mr. Smith's Medical Condition Is Complex And His Claim Is Far From Frivolous

Plaintiff's action against defendants alleges deliberate indifference to his serious medical conditions which are now known to be spinal and brain medical conditions which caused, and continue to cause, Mr. Smith to endure increased pain and suffering. *Edwards v. Snyder,* 478 F.3d 827, 830-31 (7th Cir. 2007) ("a medical condition 'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention'" satisfies the objective element of a deliberate indifference claim) (citing *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005)). Mr. Smith generally maintains that defendants were deliberately indifferent because Mr. Smith repeatedly sought medical assistance, diagnosis, and treatment for his serious medical conditions so that defendants were aware of substantial risk of harm to Mr. Smith but defendants disregarded the risk and did not timely or appropriately diagnose or treat Mr. Smith causing him to endure more pain and suffering than necessary. *Edwards v. Snyder,* 478 F.3d at 831 (a deliberate indifference claim requires both an objectively serious risk of harm and a subjectively culpable state of mind). The fact that Mr. Smith did receive care from the defendants on multiple occasions for his complaints does not defeat Mr. Smith's claim of deliberate indifference but to the contrary shows the treatment provided to him was so blatantly inappropriate as to evidence intentional mistreatment likely to serious aggravate his medical condition. *Petties v. Carter,* 836 F.3d 722, 729-30 (7th Cir. 2016) (en banc)

While defendants' retained experts do not agree that Mr. Smith was subjected to deliberate indifference, defendants' experts do not dispute that Mr. Smith has anatomical correlation of neurological origin for at least some of his pain. Ex. 14, Mathis Dep., p. 57, Ex. 13, Zelby Dep. p.

7

56, Ex. 9, Slavin pp. 36, 39. Mr. Smith maintains, for example, that Dr. Obaisi, who was in charge of Mr. Smith's primary care: ignored Mr. Smith's full list of symptoms and Mr. Smith's repeated requests for diagnosis and effective treatment; persisted in a course of treatment for Mr. Smith known to be ineffective; chose an easier and less efficacious treatment for Mr. Smith without exercising professional judgment; and, sanctioned delays in testing, diagnosis and treatment of Mr. Smith for no penological interest, with resulting harm to Mr. Smith. *Petties v. Carter*, 836 F.3d at 729-30 (there are several situations, any one of which, that can show deliberate indifference including: (a) a "decision to ignore a request for medical assistance, (b) "refus[al] to take instructions from a specialist," (c) "perist[ance]" in a course of treatment known to be ineffective," (d) "choos[ing] an easier and less efficacious treatment without exercising professional judgment," and/or (e) "inexplicable delay in treatment which serves no penological interest.").

For example, and not by way of limitation, even after Mr. Smith received approval on May 19, 2014 for an MRI that MRI was limited to a cervical MRI and it didn't take place until December 11, 2014. Dr. Slavin testified that seven (7) months was beyond a reasonable length of time in the community to wait to have an approved MRI take place. Ex.9, Slavin Dep. p. 32-33. Thereafter, Dr. Obaisi diagnosed Mr. Smith with cervical radiculopathy yet persisted in continuing to treat Mr. Smith with prednisone regimes, as well as other medications, already reported as ineffective by Mr. Smith. Ex. 17 (04/08/15 Offender Outpatient Progress Notes). Defendants' expert Dr. Mathis testified that he had used prednisone to treat patients with cervical radiculopathy but he had never prescribed a third regime of prednisone when two early regimes had proven ineffective as was done for Mr. Smith. Ex. 14, Mathis Dep. p. 54-55. Yet, again defendants' experts find no fault with Mr. Smith's care.

Defendants' expert Dr. Zelby testified that Mr. Smith was known to have lumbar spine problems from a 2003 MRI, but that a new lumbar MRI would be in order based on Mr. Smith's symptoms forming the basis of his more current complaints. Ex. 13, Zelby Dep. pp 26, 71. A new lumbar MRI, however, didn't take place until March 31, 2016, and it showed Mr. Smith also had anatomical correlation to lumbar radiculopathy. Ex. 3, Ex. 5 (Assessment and Plan at KS001971), Ex. 13, Zelby Dep. p. 40. All of the foregoing delayed Mr. Smith's full diagnosis and treatment. Yet defendants' experts opine that Mr. Smith suffered no ill consequences from any of the foregoing.

Mr. Smith finally had a neurosurgery consult in June of 2016 with Dr. Slavin who listened to the same complaints Mr. Smith had repeatedly told Dr. Obaisi, and Dr. Slavin recommended a brain MRI for Mr. Smith which ultimately took place on October 25, 2016. Ex. 5, Ex. 7. Both defendants' retained experts and Dr. Slavin agree that Mr. Smith's brain MRI shows Mr. Smith suffered an earlier brain injury resulting in loss of brain matter. Ex. 13, Zelby Dep. pp. 44, 45, Ex. 9, Slavin Dep. pp.16, 24-25, Ex. 14, Mathis Dep. pp 57, 73-75. However, defendants' retained experts opine that Mr. Smith's brain injury is not the cause of any of his pain in direct disagreement with Dr. Slavin.

Specifically, defendants' retained neurosurgeon Dr. Zelby disagrees with Dr. Slavin as to the extent of Mr. Smith's brain injury and the effect of it on Mr. Smith. Dr. Slavin reported/testified Mr. Smith's MRI "clearly shows a large area of missing brain matter in the left frontal region." Ex6, and Ex 9, Slavin Dep. p. 16. In contrast, Dr. Zelby testified that while there was a noticeable loss of brain mater it was a small frontal polar area. Ex. 13, Zelby Dep. pp. 52-53 Dr. Slavin reported Mr. Smith's "right sided symptoms now seem to be more explained by the patient's brain situation," and Dr. Slavin suggested that other pain medications or doses should be

9

tried to control Mr. Smith's pain. Ex. 6. Dr. Slavin also testified that Mr. Smith's brain pathology accounts for his pain on the right side of his body. Ex. 9, Slavin Dep. pp. 28-29. In contrast, Dr. Zelby testified he disagreed with Dr. Slavin that Mr. Smith's right-sided symptoms now seem to be more explained by the patient's brain situation. Ex. 13, Zelby Dep. p. 59. Dr. Zelby based his opinion, in part, on Mr. Smith's medical history, which history was not fully available to Dr. Slavin (Ex. 9 Slavin Dep. p. 34), and in part on his analysis of the same MRI of Mr. Smith that Dr. Slavin had reviewed. Ex. 13, Zelby Dep. pp.44-45. Defendants' other expert Dr. Mathis also testified he wasn't sure Mr. Smith's left frontal lobe correlates with his pain. Ex. 14, Mathis Dep. p. 57.

## Federal Rule of Evidence 706 and Decisional Law Support Appointment of a Neutral Expert

Federal Rule of Evidence 706 provides: "On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations. The court may appoint any expert that the parties agree on and any of its own choosing." Fed.R.Evid.706(a).

The Seventh Circuit encourages the appointment of neutral experts where an indigent plaintiff, pursuing a meritorious claim, such as Mr. Smith here, is handicapped by facing defendant's retained experts. *Rowe v. Gibson*, 798 F.3d 622, 631-32 (7th Cir. 2015) ("Because of the profound handicaps under which the plaintiff is litigating and the fact that his claim is far from frivolous, we urge the district judge to give serious consideration to … appointing a neutral expert witness, authorized by *Fed.R.Evid. 706*, to address the medical issues in this case ….").

The policy goal of Rule 706 is to promote accurate fact finding. 29 Charles Alan Wright & Victor Gold, Federal Practice & Procedure §§6302 & 6304 (2nd ed. 2016). Thus, courts will appoint experts when: (1) there is a danger that a court will not receive a balanced view of the

matter because one side cannot present an expert witness; and, (2) there is conflicting evidence. *Id.* at §6304. Both situations are present here.

The foregoing limited synopsis of Mr. Smith's medical history,[2] and the fact that defendants have deemed it necessary to employ two (2) highly paid retained experts and identify three (3) non-retained experts, together with the fact that it is Mr. Smith's spine and brain pathology at issue and there is directly conflicting evidence relating to such pathology, demonstrate complex medical conditions need to be addressed which are not easily understood by a layperson. Plaintiff has no funds to secure his own expert and plaintiff has no control over the doctors, such as Dr. Slavin, who treated plaintiff. Also, even if plaintiff were able to subpoena a treating physician, such as Dr. Slavin, to testify at trial, plaintiff does not have the funds to pay the fees such a treating doctor may require nor would it be feasible to have such treating doctor review and opine on plaintiff's complete medical records for the first time on the stand.

In view of the complex medical issues, and the imbalance in experts, the court would benefit from a neutral expert's view of Mr. Smith's medical history, diagnosis, and treatment. *Norwood v. Zhang*, 2013 U.S.Dist.LEXIS 131439 at *7 (N.D. IL September 13, 2013) ("Rule 706 may also be used where one party fails to present expert testimony, leaving the jury with an 'unbalanced presentation of the issues.'") (internal cites omitted). A neutral, court-appointed medical expert especially one skilled in spinal and traumatic brain injuries, such as a neurosurgeon or neurologist, would be able to review Mr. Smith's medical records, and the related records related to Mr. Smith's requests for medical care, be able to examine Mr. Smith if

---

[2] Dr. Mathis's expert report devotes 15 pages to summarize Mr. Smith's medical chronology. While plaintiff does not agree that Dr. Mathis's summary is fully accurate or compete, Dr. Mathis's history demonstrates the medical conditions at issue are involved and complex, and the limited highlights set forth herein are sufficient to show the need to appoint a neutral expert.

11

deemed appropriate, and be able to discuss the professional standard of care for treating Mr. Smith's condition and provide a neutral opinion as to whether defendants' conduct fell below that standard of care and resulted in harm to Mr. Smith.[3]

A neutral medical expert could inform the court and jury on the multiple contested issues in this case involving complex medical evidence such as : (1) whether Mr. Smith's symptoms dictated that he should have been evaluated by a neurosurgeon or neurologist sooner than June 2016; whether Mr. Smith's symptoms dictated that he should have had a brain MRI/MRA sooner than October 2016; whether the failure to timely diagnose Mr. Smith's spinal and brain conditions caused Mr. Smith to endure increased pain and suffering; whether the care Defendants provided to Mr. Smith was blatantly inappropriate and was the easy path; whether defendants chosen treatment regimen was appropriate in light of any risk Mr. Smith's condition posed to his health; whether Mr. Smith proximately suffered any injury from any alleged misdiagnosis, delay in treatment, or inadequate treatment by defendants; and, whether Mr. Smith, if diagnosed or treated differently would likely have suffered less pain.

The decisional law amply supports appointment of a neutral medical expert here. *See Norwood v. Zhang*, 2013 U.S.Dist.LEXIS 131439 at *21-22 (appointing neutral medical expert to consider plaintiff's ocular related condition and the diagnosis and treatment thereof); *Gilman v. Corizon Med. Servs.*, 2017 U.S.Dist.LEXIS 204586 at *5 (S.D. IN December 12, 2017) (appointing neutral medical general practitioner to provide an opinion relating to plaintiff's claim of deliberate indifference to his arthritis in his knee and need for knee replacement); *Niksich v.*

---

[3] Defendants here have identified two retained medical experts – Dr. Mathis (a correctional medicine doctor) and Dr. Zelby (a neurosurgeon). Accordingly, plaintiff submits that if both Dr. Mathis and Dr. Zelby are ultimately permitted to provide medical opinions at trial then it is entirely appropriate here to appoint two neutral experts to avoid prejudice to plaintiff.

*Corizon Inc.*, 2017 U.S.Dist.LEXIS 111888 at *10 (S.D. IN July 19, 2017) (appointing neutral medical expert to provide an opinion relating to plaintiff's claim of deliberate indifference to his Hepatitis C and resulting liver issues); *Kelly v. Talbit*, 2017 U.S.DistLEXIS 27025 (S.D. IN February 27, 2017) (the court on its own proposed a neutral expert be appointed to consider plaintiff's claim of deliberate indifference to his need for treatment for degenerative disk disease in his lumbar and cervical spine and degenerative bone disease in his hips).

### The Court Should Exercise Its Discretion and Apportion the Expert Fee to Defendants

Federal Rules of Evidence 706 also provides: "The expert is entitled to a reasonable compensation, as set by the court. The compensation is payable …by the parties in the proportion and at the time that the court directs – and the compensation is then charged like other costs." Fed.R.Evid 706(c)(2).

Mr. Smith has been incarcerated for thirty years and the court recognized his indigent status by allowing him to proceed *in forma pauperis*. In contrast, defendant Wexford is well-heeled with a multi-year contract with the Illinois Department of Corrections worth over one hundred million dollars each year, and Wexford and its employees, e.g. Dr. Funk and Dr. Obaisi (now deceased) are covered by a liability insurance policy of up to $3,000,000 per claim. Ex. 15, Ex.16. Additionally, defendants have had no hesitation in hiring two outside experts charging $600 and $800 per hour, respectively. Additionally, defendants willingly paid Dr. Slavin his required $1,500 per hour fee to sit for his deposition when they thought his testimony would be helpful to their cause.

The Seventh Circuit recognizes that Fed.R.Evid. 706 allows the district court discretion in the apportionment of the reasonable compensation for the expert. *Rowe v. Gibson*, 798 F.3d 622 at

13

632. ("a court-appointed expert 'is entitled to a reasonable compensation, as set by the court,' and that 'the compensation is payable ... in any ... civil case [not involving just compensation under the *Fifth Amendment*] by the parties in the proportion and at the time that the court directs—and the compensation is then charged like other costs.' **In light of Rowe's indigency, the court if it appoints its own expert witness will have to order the defendants to pay the expert a reasonable fee if the expert is unwilling to work for nothing.** Most prisons are strapped for cash, and this is something for the district court to bear in mind in deciding on whether and how large a fee to order the defendants to pay a court-appointed expert witness in a case (such as this case) that has sufficient merit to warrant such an appointment.") (emphasis added).

This court, as well as sister district courts in the Seventh Circuit have apportioned the cost of a neutral expert to defendants in circumstances similar to those present here. *Norwood v. Zhang*, 2013 U.S.Dist.LEXIS 131439 at *19 (N.D. IL September 13, 2013) (appointing neutral medical expert and apportioning first $4,000 in fees between plaintiff and defendant (where plaintiff had received $5,000 in settlement with another defendant) and fees there over to defendant in the first instance); *Gilman v. Corizon Med. Servs.*, 2017 U.S.Dist.LEXIS 204586 at *5 (S.D. IN December 12, 2017) (appointing neutral medical expert and apportioning first $15,000 in fees between defendants and the court and fees there over to defendants in the first instance); *Niksich v. Corizon Inc.*, 2017 U.S.Dist.LEXIS 111888 at *10 (S.D. IN July 19, 2017) (appointing neutral medical expert and apportioning first $15,000 in fees between defendants and the court and fees there over to defendants in the first instance). The Seventh Circuit also recognizes that the discretion in apportionment of the reasonable compensation for the neutral expert authorizes the court to apportion the full cost of the court appointed expert to one party. *Ledford v. Sullivan*, 105 F.3d 354, 361 (7th Cir. 1997) ("In this case, when the district court stated no funds existed to pay for

the appointment of an expert, it failed to recognize that it had the discretion to apportion all the costs to one side.").

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests the court grant plaintiff's motion, and appoint one or more neutral court appointed medical experts and apportion the expenses related to such appointed expert(s) so as to relieve plaintiff and his appointed counsel in the first instance from any compensation obligation for such court appointed expert(s).

Respectfully submitted,

/s/ David Lesht
David Lesht
The Law Office of Eugene M. Cummings, P.C.
55 W. Monroe Street, Suite 3500
Chicago, IL 60606
Tel: (312) 948-4403
E-Mail: dlesht@emcpc.com
Attorney for Plaintiff, Kevin Smith

## CERTIFICATE OF SERVICE

I hereby certify that on this day, September 11, 2018, I electronically filed and also thereby served the foregoing Memorandum in Support of Plaintiff's Renewed Motion For A Court Appointed Expert And Full Apportionment of Compensation For Such Expert to Defendants including the Exhibits thereto ("Memorandum") using the CM/ECF system on counsel for defendants: Ghaliah Obaisi, Independent Executor of The Estate of Dr. Saleh Obaisi, and Dr. Arthur Funk (as an individual and in his official capacity/Wexford Health Sources, Inc.).

Dated: September 11, 2018

/s/ David Lesht